# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NARENDRA PULIMI,

        Plaintiff,

    v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,[1]

        Defendant.

No. 12 C 1824

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Narendra Pulimi filed this action seeking review of the final decision of the Commissioner of Social Security (Commissioner) denying his application for Disability Insurance Benefits under Title II of the Social Security Act (SSA). 42 U.S.C. §§ 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and the parties have filed cross motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB) or Supplemental Security Income (SSI) under Titles II and XVI of the SSA, a claimant must establish that he or she is

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 26(d)(1).

disabled within the meaning of the SSA.[2] *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?

2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?

3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?

4. Is the claimant unable to perform his or her former occupation?

5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on July 2, 2009, alleging that he became disabled on September 29, 2008, because of chronic pancreatitis, insulin dependent diabetes mellitus, and neuropathy.[3] (R. at 70–71, 75, 97, 103, 176). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 70–71, 75, 93, 97, 100, 103, 105).

On December 7, 2010, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (R. at 18–69, 75). The ALJ also heard testimony from Julian J. Freeman, M.D., a medical expert (ME), and Susan A. Entenberg, a vocational expert (VE). (*Id.*).

The ALJ denied Plaintiff's request for benefits on February 9, 2011. (R. at 75–83). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since September 29, 2008, the alleged onset date. (*Id.* at 77). At step two, the ALJ found that Plaintiff's pancreatitis, diabetes mellitus, IgA nephropathy,[4] and oligospermia[5] are severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.*).

---

[3] Neuropathy is a disease of the cranial or spinal nerves. *Stedman's Medical Dictionary* 948 (5th ed. 1982).

[4] IgA nephropathy is the most common form of kidney inflammation. <en.wikipedia.org/wiki/IgA_nephropathy>

[5] Oligospermia is "a subnormal concentration of spermatozoa in the penile ejaculate." *Stedman's Medical Dictionary* 980 (5th ed. 1982).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[6] and determined that he has the RFC to perform light work "except that [Plaintiff] is limited to lifting and carrying up to 10 pounds only, performing only a few postural movements per work shift, and no exposure to heavy and frequent vibrations." (R. at 78). At step four, based on Plaintiff's RFC, his vocational factors and the VE's testimony, the ALJ determined that Plaintiff can perform his past relevant work as an electrical engineer. (Id. at 82–83). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the SSA. (*Id.* at 83).

The Appeals Council denied Plaintiff's request for review on September 30, 2011. (R. at 5–9). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's

---

[6] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. DISCUSSION

### A. The Relevant Medical Evidence

In June 1997, Plaintiff was diagnosed with acute pancreatitis. (R. at 253–54). He began treating with RamaKrishna P. Venugopalan, M.D. in 1998. (*Id.* at 182). By February 2002, Plaintiff reported recurrent episodes of pancreatitis associated with

abdominal pain, nausea, and vomiting. (R. at 667). Subsequently, on February 14, 2002, he underwent a distal subtotal pancreatectomy with islet cell autotransplantation, splenectomy, cholecystectomy, liver biopsy, intraoperative ultrasound, and intraoperative portography. (*Id.*).

A December 2005 test revealed that Plaintiff has two mutations of the CFTR gene.[7] (R. at 1484). These mutations are likely contributing to his pancreatic symptoms. (*Id.* at 1485). In June 2006, Plaintiff was seen by the University of Pittsburgh Medical Center's Digestive Disorder Center. (*Id.* at 1488–90). David C. Whitcomb, M.D. observed that Plaintiff's pancreatitis was originally thought to be idiopathic.[8] (*Id.* at 1488). However, Dr. Whitcomb opined that the newly discovered CFTR gene mutations are "most likely sufficient to cause a high risk of developing pancreatitis." (*Id.* at 1489).

Since September 29, 2008, Plaintiff's alleged onset date, he has been treated at an emergency room for pancreatitis 18 times. (R. at 1042–43, 1044–45, 1068–69, 1080–81, 1090–91, 1155–56, 1164–65, 1187–88, 1223–25, 1233–34, 1243–44, 1293–99, 1301–09, 1310–16, 1318–25, 1327–35, 1403–22). On December 2, 2008, Plaintiff underwent a stent placement for a stricture of his bile duct. (R. at 1040–41). Thereafter, Dr. Venugopalan opined that Plaintiff was limited to sitting, standing, and

---

[7] The cystic fibrosis transmembrane conductance regulator (CFTR) gene provides instructions for making a protein that functions as a channel across the membrane of cells that produce mucus, sweat, saliva, tears, and digestive enzymes. <ghr.nlm.nih.gov/gene/CFTR>

[8] An idiopathic disease has no known cause. *Stedman's Medical Dictionary* 690 (5th ed. 1982).

walking intermittently for three hours in an eight-hour workday. (*Id.* at 877). He further opined that Plaintiff was capable of climbing, twisting, bending, stooping, reaching above shoulder level, and operating a motor vehicle. (*Id.*). Dr. Venugopalan also concluded that Plaintiff could return to his regular occupation, full time, as of January 5, 2009. (*Id.*). However, by February 2009, Dr. Venugopalan opined that Plaintiff is "unable to concentrate due to narcotic intake." (*Id.* at 891). He further concluded that Plaintiff could sit, stand, and walk only two hours, each, intermittently, per day. (*Id.*).

On June 30, 2009, Plaintiff reported abdominal pain from his chronic pancreatitis. (R. at 1068). In August 2009, Plaintiff underwent another stent replacement to gradually increase the size of the stent. (*Id.* at 1179).

On August 16, 2009, Dr. Venugopalan completed a Gastro-Intestinal Report for the Commissioner. (R. at 555–58). He diagnosed Plaintiff with chronic pancreatitis with acute exacerbations, insulin dependent diabetes mellitus, pancreatic insufficiency, weight loss, dyslipidemia, IgA nephropathy, and chronic abdominal pain. (*Id.* at 555). Dr. Venugopalan noted that Plaintiff receives ERCP with a stent change every three to four months, which helps manage Plaintiff's pain caused by flare-up of pancreatitis.[9] (*Id.*). Dr. Venugopalan concluded that Plaintiff's day-to-day activities are limited especially when he has pain related to flare-up of pancreatitis.

---

[9] Endoscopic retrograde cholangiopancreatography (ERCP) is a procedure used to identify stones, tumors, or narrowing in the bile ducts. <www.nlm.nih.gov/medlineplus>

(*Id.* at 558). He also opined that Plaintiff could lift only up to ten pounds occasionally. (*Id.*).

On September 5, 2009, Julia Koban, M.D., completed an internal medicine consultative examination on behalf of the Commissioner. (R. at 1181–84). She reviewed relevant medical reports and obtained a history of Plaintiff's complaints. (*Id.*). Plaintiff reported frequent pain flare-ups, which require him to undergo an ECRP every three to four months. (*Id.* at 1181). He reported being incapacitated for two to three days after each procedure. (*Id.*). Plaintiff also reported nausea, diarrhea, and abdominal pain. (*Id.* at 1182). Dr. Koban observed that Plaintiff has frequent episodes of acute pain secondary to frequent pancreatitis exacerbations, and multiple hospitalizations with acute pancreatitis. (*Id.* at 1183). On examination, Dr. Koban found that Plaintiff ambulates independently and has full range of motion. (*Id.* at 1184). Plaintiff's neurological, cardiac, and pulmonary examinations were normal. (*Id.*). Dr. Koban concluded that Plaintiff "is mostly limited by the frequency of his pain attacks." (*Id.*).

On September 8, 2009, Plaintiff reported nausea and severe pain lasting two days. (R. at 1193). His physician diagnosed chronic pancreatitis with acute flare-up. (*Id.* at 1194). Nevertheless, the physician noted that Plaintiff had clinically improved after his diet was modified. (*Id.*).

Also on September 8, 2009, Barry Free, M.D., a nonexamining, state-agency physician, reviewed Plaintiff's medical records and completed a physical RFC assessment. (R. at 1213–20). Dr. Free opined that Plaintiff could occasionally lift 20

pounds, frequently lift 10 pounds, and stand, walk, and sit about six hours in an eight-hour workday. (*Id.* at 1214).

In October 2009, Plaintiff reported improved pancreatic symptoms since his last stent placement. (R. at 1187). One of his physicians, Rodney J. Avery, M.D., opined that Plaintiff's pain may be due to his periesophageal hernia, more so than his pancreatitis. (*Id.* at 1225). A November 2009 diagnostic image of Plaintiff's pancreas did not indicate significant pancreatic duct filling. (*Id.* at 1241).

In mid-November 2009, Plaintiff underwent an ERCP and a plugged stent was replaced with a new one. (R. at 1245). A few days later, Plaintiff was admitted to the hospital after he reported abdominal pain, radiating to the back, nausea, and increased lipase levels. (*Id.* at 1243, 1245). Plaintiff was diagnosed with post-ERCP pancreatitis. (*Id.* at 1245). After a week in the hospital, Plaintiff's symptoms improved and his lipase levels trended down. (*Id.*). On December 4, 2009, Plaintiff was released home on medications. (*Id.*).

In February 2010, a diagnostic examination found interval enlargement of Plaintiff's pancreatic head with increasing pancreatic ductal dilation and surrounding inflammation consistent with recurrent pancreatitis. (R. at 1324). In March and July 2010, ERCP procedures were performed, and Plaintiff's stents were replaced. (*Id.* at 1378–79, 1477–78). In August 2010, Plaintiff reported being in and out of the hospital every month over the previous six months with acute bouts of pancreatitis. (*Id.* at 1521). By December 2010, Plaintiff was undergoing stent replacements every three months. (*Id.* at 1517, 1522).

On December 31, 2010, Dr. Venugopalan summarized his medical findings:

> [Plaintiff] is a 38-year-old gentleman who has been under my care for the last several years. . . . He was referred to us with a history of chronic pancreatitis. . . . At the recommendation of multiple consultants, it was decided to go ahead with a pancreatectomy. . . . He had some temporary relief after the surgery. However, he had recurrent pain a year later, which necessitated the investigation with additional ERCP which showed a stricture in the remaining pancreatic duct. The management of this was further discussed, and he underwent a dilation of the stricture rather than recurrent surgery.
>
> In the meanwhile, [Plaintiff] also developed IgA nephropathy, oligospermia, and nonalcoholic fatty liver disease proven by biopsy. [Plaintiff] as a result of his chronic pancreatitis developed Insulin-dependent diabetes mellitus. He was having recurrence of his pain even after the dilation of the pancreatic stricture, and therefore, he went . . . for a second opinion. After multiple evaluations . . . they came up with the diagnosis that his pancreatitis may be related to CFTR gene mutation. They further recommended conservative management with exogenesis pancreatic enzyme, acid suppression and pain management with endoscopic therapy as needed. [Plaintiff] continues to have a stricture in the remaining pancreatic duct which was rather dominant which is being treated with a stent placement as it was felt that he is not a candidate for total pancreatectomy. He does undergo periodic ERCP with stent replacement. As of late, he also has some depression related to his chronic disabling pancreatitis for which there is no cure. Since his pancreatic gland is destroyed, his acute flare-ups of pancreatitis are difficult to diagnose and there is no enzyme elevation. He usually develops severe pain associated with leukocytosis.[10]
>
> It is my impression therefore that he has chronic pancreatitis from genetic mutation, probably related to CFTR characterized by multiple pancreatic duct strictures complicated with pseudocysts requiring pancreatectomy and continuing care with endotherapy, pain medication and exogenous enzymes. His prognosis is guarded.

(R. at 1514–15).

---

[10] Leukocytosis is a white blood cell count above the normal range, as observed in acute infections. *Stedman's Medical Dictionary* 780 (5th ed. 1982). Acute pancreatitis "is marked by sudden severe abdominal pain, nausea, fever, and leukocytosis." *Id.* at 1019.

At the administrative hearing, Plaintiff testified that since 1997, he has been hospitalized 80 times, mostly through the emergency room. (R. at 27). Just since September 2008, he has been hospitalized 18 times. (*Id.* at 27, 46). He stated that the pancreatic attacks are becoming more frequent, from a year apart in 1997 to every few months by 2010. (*Id.* at 27). Plaintiff stated that by September 2008, his condition had progressed from acute to chronic. (*Id.* at 31, 43). He gets three to four acute pain attacks a month, which can take two to three days to go away. (*Id.* at 43–46). Even with high dosages of pain medication, the pain is often intolerable. (*Id.* at 32). Plaintiff testified that he experiences side effects from the pain medications, including nausea and sleepiness. (*Id.* at 43–44). He also testified that he has lost about 40 pounds in the previous three years. (*Id.* at 50).

The ME opined that Plaintiff's underlying diagnosis is chronic pancreatitis with multiple pancreatic resections and stent replacements, along with moderate diabetes. (R. at 23). Nevertheless, the ME found that Plaintiff's pancreas has not shown indications of progressive inflammation or the usual signs of duct obstruction or dilation that should be present with chronic pancreatitis. (*Id.* at 35). The ME opined that the investigation of the causation is incomplete—there is no malnutrition, no progressive pancreatic damage, and no confirmation of genetic origin. (*Id.*).

The ME found that Plaintiff's reports of pain are "relatively unexplained," and surmised that they may have a psychiatric origin. (R. at 23, 25–26). The ME also voiced a concern with Plaintiff's high level of narcotic usage. (*Id.* at 35). The ME stated that large levels of narcotics are only needed with persons who have severe,

long-lasting pancreatitis, typically in congenital or genetically determined pancreatitis, which, the ME opined, Plaintiff does not have. (*Id.* at 42).

The ME also found no medical basis for Dr. Venugopalan's February 2009 functional assessment. (R. at 36–37). After listening to Plaintiff's testimony at the hearing, the ME opined that Plaintiff's ability to concentrate and to assemble knowledge and express thoughts "is really quite good." (*Id.* at 40–41).

## B. Analysis

### 1. The Weight to be Afforded Plaintiff's Treating Physician

Plaintiff contends that the ALJ failed to give proper deference to the opinions of Dr. Venugopalan, his treating physician. (Mot. 3–4). Plaintiff argues that the ALJ did not discuss the factors that must be considered when a treating source's opinion is not given controlling weight. (*Id.* at 3). Moreover, the ALJ rejected Dr. Venugopalan's opinion in favor of the ME's opinion, which was based solely on a review of the medical record. (*Id.* at 4).[11]

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord*

---

[11] To support his arguments, Plaintiff's counsel inexplicably cited to opinions from the Sixth Circuit instead of the Seventh Circuit, where this Court is located.

*Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted).

If a nontreating physician contradicts the treating physician's opinion, it is the ALJ's responsibility to resolve the conflict. *Books*, 91 F.3d at 979 (ALJ must decide which doctor to believe). An ALJ may reject the opinion of a treating physician in favor of the opinion of a nontreating physician where the nontreating physician has special, pertinent expertise and where the issue is one of interpretation of records or results rather than one of judgment based on observations over a period of time. *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992) ("[I]t is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or . . . the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence."); *Hofslien v. Astrue*, 439 F.3d

375, 377 (7th Cir. 2006) ("So the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances."). In sum, "whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

Plaintiff has treated with Dr. Venugopalan for over 12 years, beginning in 1998 and continuing through at least December 2010. (R. at 182, 1514–15). In December 2008, Dr. Venugopalan opined that Plaintiff was limited to sitting, standing, and walking intermittently for three hours in an eight-hour workday. (*Id.* at 877). By February 2009, Dr. Venugopalan concluded that Plaintiff could sit, stand, and walk for only two hours, intermittently, per day, and was unable to concentrate because of his pain medications. (*Id.* at 891). In August 2009, Dr. Venugopalan opined that Plaintiff's day-to-day activities are limited by pain associated with the flare-up of his pancreatitis. (*Id.* at 558).

In December 2010, Dr. Venugopalan summarized his medical findings. (R. at 1514–15). He diagnosed "chronic pancreatitis from genetic mutation, probably re-lated to CFTR characterized by multiple pancreatic duct strictures complicated by pseudocysts requiring pancreatectomy and continuing care with endotherapy, pain medication and exogenous enzymes." (*Id.* at 1515). He also noted that because Plaintiff's "pancreatic gland is destroyed, his acute flare-ups of pancreatitis are dif-ficult to diagnose and there is no enzyme elevation." (*Id.*). Instead, Plaintiff "usually

develops severe pain associated with leukocytosis." (*Id.*). Dr. Venugopalan concluded that Plaintiff's "prognosis is guarded." (*Id.*).

In his decision, the ALJ acknowledged that Dr. Venugopalan is an expert in the field of gastroenterology. (R. at 82). Nevertheless, he gave Dr. Venugopalan's opinion "little weight" because "the record of objective medical findings does not support the extreme limitations placed on [Plaintiff]." (*Id.*). Instead, "given [the ME's] review of [Plaintiff's] medical record and his evaluation and questioning at the hearing," the ALJ gave "significant weight" to the ME's opinion (*Id.*). The ALJ adopted the ME's opinion that "the usual signs of ductal obstruction have been missing and [Plaintiff] has a high level of narcotic use, and investigation of causation is incomplete and genetic testing did not determine a cause of origin." (*Id.* at 81).

Under the circumstances, the ALJ's decision to give Dr. Venugopalan's opinions "little weight" is legally insufficient and not supported by substantial evidence. First, the ALJ did not explain which parts of Dr. Venugopalan's opinions he was adopting and which parts he was rejecting. While the ALJ is not required to address every piece of evidence, he must provide a "logical bridge" between the evidence and her conclusion. *See Terry v. Astrue,* 580 F.3d 471, 475 (7th Cir.2009). "An ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford,* 227 F.3d at 870; *see Rohan v. Chater,* 98 F.3d 966, 968 (7th Cir.1996) ("As this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Instead, the ALJ must provide specific, legitimate

reasons for rejecting the treating physician's findings. *Clifford,* 227 F.3d at 870; *accord Rojas v. Astrue,* 2010 WL 4876698, at \*8 (N.D.Ill. Nov.19, 2010); *see* 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons . . . for the weight we give your treating source's opinion."); Social Security Ruling (SSR)[12] 96–2p, at \*5 ("decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight"). In effect, the ALJ erred when he substituted his judgment for that of Dr. Venugopalan's and left unexplained why he was ignoring some but not all of Dr. Venugopalan's observations and findings. *See Clifford,* 227 F.3d at 870.

Second, Dr. Venugopalan's opinion that Plaintiff's day-to-day activities are limited by pain associated with the flare-up of his pancreatitis (R. at 558) is supported by the medical record. Since September 29, 2008, Plaintiff's alleged onset date, he has been treated at an emergency room for pancreatitis 18 times. (*Id.* at 1042–43, 1044–45, 1068–69, 1080–81, 1090–91, 1155–56, 1164–65, 1187–88, 1223–25, 1233–34, 1243–44, 1293–99, 1301–09, 1310–16, 1318–25, 1327–35, 1403–22). Dr. Koban, who performed a consultative examination on behalf of the Commissioner in Sep-

---

[12] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel,* 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue,* 559 F.3d 736, 744 (7th Cir. 2009).

tember 2009, agreed that Plaintiff is "limited by the frequency of his pain attacks." (*Id.* at 1184). In February 2010, a diagnostic examination found interval enlargement of Plaintiff's pancreatic head with increasing pancreatic ductal dilation and surrounding inflammation consistent with recurrent pancreatitis. (*Id.* at 1324). In March and July 2010, ERCP procedures were performed and Plaintiff's stents were replaced. (*Id.* at 1378–79, 1477–78). In August 2010, Plaintiff reported being in and out of the hospital every month over the previous six months with acute bouts of pancreatitis. (*Id.* at 1521). By December 2010, Plaintiff was undergoing stent replacements every three months. (*Id.* at 1517, 1522).

The ME, without citing to the record, opined that Plaintiff's pancreas is "very stable," has shown no "indications of progressive inflammation," and "usual signs of obstruction of duct dilation . . . have been absent." (R. at 35). On the contrary, Plaintiff undergoes ERCP with a stent change every few months. (*Id.* at 555, 1378–79, 1477–78, 1517, 1521, 1522). In November 2009, a plugged stent had to be replaced. (*Id.* at 1245). In February 2010, a diagnostic examination found interval enlargement of Plaintiff's pancreatic head with increasing pancreatic ductal dilation and surrounding inflammation consistent with recurrent pancreatitis. (*Id.* at 1324). As Dr. Venugopalan explained, Plaintiff "has chronic pancreatitis . . . characterized by multiple pancreatic duct strictures complicated with pseudocysts requiring pancreatectomy and continuing care with endotherapy, pain medication and exogenous enzymes." (*Id.* at 1515).

Third, the ME's opinion on the source of Plaintiff's pain should be afforded little to no weight. The ME discounted Plaintiff's reports of pain as "relatively unexplained," and surmised that they may have a psychiatric origin. (R. at 23, 25–26). While the ME is a specialist in internal medicine and neurology, he has no expertise in psychology or psychiatry. (*Id.* at 1513). While Dr. Venugopalan noted that Plaintiff "has some depression related to his chronic disabling pancreatitis for which there is no cure" (*Id.* at 1515), there is no evidence in the medical record that Plaintiff is malingering or that his pain symptoms are the result of a somatoform disorder.[13] Dr. Venugopalan also explained that because Plaintiff's "pancreatic gland is destroyed, his acute flare-ups of pancreatitis are difficult to diagnose and there is no enzyme elevation;" instead, his "severe pain [is] associated with leukocytosis." (*Id.*).

Fourth, there is no evidence that Plaintiff was abusing his narcotic medications. The ME voiced a concern with Plaintiff's high level of narcotic usage. (R. at 35). The ME stated that large levels of narcotics are only needed with persons who have severe, long-lasting pancreatitis, typically in congenital or genetically determined pancreatitis, which, the ME opined, Plaintiff does not have. (*Id.* at 42). But there is significant evidence that Plaintiff's pancreatitis has a genetic origin. (*Id.* at 1484–85, 1488–89). A December 2005 test found that Plaintiff has two mutations of the

---

[13] Plaintiff argues that the ALJ should have developed the record regarding a possible mental impairment. (Mot. 6–7). But the medical record is devoid of any indicia of mental impairments. Throughout the 2242-page record, Plaintiff identifies only three isolated references to "depression." (*Id.* 7 (citing (R. at 193, 1161, 1515)). And none of these references suggest any work-related impairments. Moreover, when the ALJ asked Plaintiff's counsel at the hearing whether he was interested in developing a mental health issue, Plaintiff's counsel declined. (R. at 38–39).

CFTR gene, which are likely contributing to his pancreatic symptoms. (*Id.* at 1484–85). In June 2006, Dr. Whitcomb opined that the newly discovered CFTR gene mutations are "most likely sufficient to cause a high risk of developing pancreatitis." (*Id.* at 1489). And, in December 2010, Dr. Venugopalan opined that Plaintiff "has chronic pancreatitis from genetic mutation, probably related to CFTR." (*Id.* at 1515; *accord id.* at 80 (ALJ citing evidence of genetic mutations causing pancreatitis)). Moreover, the ME's contention that Plaintiff was overmedicating is not supported by the medical record. None of Plaintiff's doctors, who have been treating his pancreatitis for more than 12 years, has expressed any concern about Plaintiff's pain medication dosages. Thus, the ALJ's conclusion that "based on the underlying science [Plaintiff] should not be having such severe symptoms and should not be taking the type of narcotic medication [he is taking]" (R. at 81) is not based on the medical record. "As this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan,* 98 F.3d at 968. "An ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford,* 227 F.3d at 870.

The ALJ did not provide the specific weight he was affording Dr. Venugopalan's opinions. *See Campbell*, 627 F.3d at 308 ("Even if an ALJ gives good reasons for not giving controlling weight to a treating physician's opinion, she has to decide what weight to give that opinion."); *Punzio*, 630 F.3d at 710 ("And whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that deci-

sion."). Generally, the Commissioner gives more weight to treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider a checklist of factors—"the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion"—to determine what weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 404.1527.

Here, the ALJ did not explicitly address the checklist of factors as applied to the medical opinion evidence. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (criticizing the ALJ's decision which "said nothing regarding this required checklist of factors"); *Bauer*, 532 F.3d at 608 (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play"). And many of the factors support the conclusion that Dr. Venugopalan's opinion should be given great weight: he is a gastroenterologist who treated Plaintiff on a regular basis for over 12 years; his findings were supported by diagnostic observations; and his findings were consistent with the medical evidence. "Proper consideration of these factors may

have caused the ALJ to accord greater weight to [Dr. Venugopalan's] opinion." *Campbell*, 627 F.3d at 308.

The Commissioner contends that controlling weight for Dr. Venugopalan's opinion was not merited given the absence of supporting medical evidence for his opinion. (Resp. 7–8). The Commissioner is correct that the medical evidence does not support Dr. Venugopalan's opinion that Plaintiff could sit, stand, and walk only two hours per day and could lift less than ten pounds. However, as discussed above, the ALJ did not identify which parts of Dr. Venugopalan's opinions he was adopting and which parts he was rejecting. And the medical evidence does support Dr. Venugopalan's opinion that Plaintiff's day-to-day activities are limited by pain associated with the periodic flare-up of his pancreatitis.

On remand, the ALJ shall reevaluate the weight to be afforded Dr. Venugopalan's opinions. If the ALJ has any questions about whether to give controlling weight to Dr. Venugopalan's opinions, he is encouraged to recontact him. *See Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) ("If the ALJ thought he needed to know the basis of medical opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them.") (citation omitted). If the ALJ finds "good reasons" for not giving Dr. Venugopalan's opinions controlling weight, *see Campbell*, 627 F.3d at 306, the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's

opinion," *Moss*, 555 F.3d at 561, in determining what weight to give Dr. Venu-gopalan's opinions.

### 2. The ALJ's Determination of Plaintiff's RFC

The ALJ found that Plaintiff has pancreatitis, diabetes mellitus, IgA nephropa-thy, and oligospermia, which cumulatively result in functional limitations. (R. at 77, 78). After examining the medical evidence and giving partial credibility to some of Plaintiff's subjective complaints, the ALJ found that Plaintiff has the ability to work at a light level of exertion, "except that [Plaintiff] is limited to lifting and carrying up to 10 pounds only, performing only a few postural movements per work shift, and no exposure to heavy and frequent vibrations." (*Id.* at 78).

Plaintiff contends that the ALJ's RFC assessment did not sufficiently account for all of his physical limitations. (Mot. 7–8). While the evidence indicates that Plaintiff would have "repeated absences from work," "the ALJ made no specific [RFC] finding as to how many days [Plaintiff] would be absent per month." (*Id.* 7, 8).

"The RFC is an assessment of what work-related activities the claimant can per-form despite her limitations." *Young*, 362 F.3d at 1000; *see* 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do de-spite your limitations."); SSR 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and men-tal activities."). The RFC is based upon medical evidence as well as other evidence,

such as testimony by the claimant or his friends and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; *see* 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

Here, the ALJ failed to construct a logical bridge between the evidence and the RFC. Plaintiff has been hospitalized 80 times since 1997. (R. at 27, 38). Between 2008 and 2010, he was treated at an emergency room 18 times for pancreatitis. (*Id.* at 1042–43, 1044–45, 1068–69, 1080–81, 1090–91, 1155–56, 1164–65, 1187–88, 1223–25, 1233–34, 1243–44, 1293–99, 1301–09, 1310–16, 1318–25, 1327–35, 1403–22). In August 2010, Plaintiff reported being in and out of the hospital every month over the previous six months with acute bouts of pancreatitis. (*Id.* at 1521). By December 2010, Plaintiff was undergoing stent replacements every three months. (*Id.* at 1517, 1522). He reported being incapacitated for two to three days after each procedure. (*Id.* at 43–46, 1181).

The ME testified that regardless of its etiology, Plaintiff's recurrent bouts of pain would cause "repeated absences from work." (R. at 25). In his decision, the ALJ stated that the ME opined Plaintiff's pancreatitis would cause him to miss "one day

of work per month."[14] (*Id.* at 82). On the contrary, the ME testified that he was unable to determine how many days Plaintiff would be absent each month due to his impairments.[15] (*Id.* at 25–26). Thus, there is no medical support for the ALJ's finding that Plaintiff would be absent only one day per month.[16]

On remand, the ALJ shall seek medical evidence to determine whether Plaintiff's pancreatitis would cause him to miss multiple days of work per month. The ALJ shall then reassess Plaintiff's RFC by "evaluating all limitations that arise from medically determinable impairments, even those that are not severe." *Villano*, 556 F.3d at 563. The RFC shall be "expressed in terms of work-related functions" and include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence. SSR 96-8p. If the ALJ determines that a second hearing is required, he "must include *all* limitations supported by medical evidence in the record" in posing hypothetical questions to the VE. *Steele*, 290 F.3d at 942.[17]

---

[14] The VE testified that missing one day per month because of Plaintiff's illnesses "is probably okay."

[15] As discussed above, the ME's contention that some of Plaintiff's absences have a psychological cause is without medical support.

[16] The Commissioner failed to address this issue.

[17] Plaintiff also argues that the ALJ failed to consider the side effects of his narcotic pain medications, especially his complaints of limited mental alertness and inability to concentrate. (Mot. 4–6; Reply 3). On the contrary, the ALJ found that Plaintiff's complaints were not fully credible (R. at 78–79), an issue which Plaintiff has not contested. And both the ALJ and the ME observed that Plaintiff's "ability to communicate and concentrate were quite good." (*Id.* at 79; *see id.* at 40–41).

## C. Summary

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to [his] conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reevaluate the weight to be afforded Dr. Venugopalan's opinions, explicitly addressing the required checklist of factors. The ALJ shall then reevaluate Plaintiff's physical impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [14] is **GRANTED**, and Defendant's Motion for Summary Judgment [19] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R :

Dated: April 24, 2013

MARY M. ROWLAND
United States Magistrate Judge